IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| R.L. WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 3:09-cv-1002 |
| v. | ) | Judge Echols/Brown |
| | ) | |
| JOE EASTERLING, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION

This action was referred to the Magistrate Judge on January 12, 2010 for further proceedings under Rule 8(b), Habeas Corpus Rules, 28 U.S.C. § 636(b)(1)(B), and Rule 7, L.R.M.P. (Docket Entry 16). Currently pending before the Magistrate Judge is Petitioner's Petition for Writ of Habeas Corpus (Docket Entry 1), to which the Respondent has filed an Answer (Docket Entry 14). Petitioner has also filed a Reply (Docket Entry 32) and a Memorandum in Opposition to the Answer (Docket Entry 35).[1] The undersigned has also reviewed the expanded record. (Docket Entry 14). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** that the Petition be **DENIED** and this matter be **DISMISSED**. The Magistrate Judge also **RECOMMENDS** Petitioner's Request for an Evidentiary Hearing (Docket Entry 33) also be **DENIED**.

### I. BACKGROUND

The Petitioner, proceeding *pro se*, is an inmate of the State of Tennessee currently

---

[1] For the purposes of this Report and Recommendation, Petitioner's Reply and Memorandum are treated as a Response to the Answer.

1

incarcerated at Hardeman County Correctional Facility in Whiteville, Tennessee. He brings this action pursuant to 28 U.S.C. § 2254 against Joe Easterling, Warden of the facility, seeking a writ of habeas corpus.

On November 30, 1999, Petitioner was charged with one count of rape by force and one count of rape without consent. (Docket Entry 14-1, pp. 5-6). A jury convicted him of both counts on October 28, 2003, and he was sentenced to twelve (12) years in prison for each count, to run concurrently, on January 23, 2004. (Docket Entry 14-1, pp. 24-25).

Petitioner appealed his case to the Tennessee Court of Criminal Appeals on April 18, 2005. (Docket Entry 14-7). On December 16, 2005, the Court of Criminal Appeals affirmed the conviction and sentence but remanded the case for merger of the two rape convictions. (Docket Entry 14-8). The Tennessee Supreme Court denied review on May 1, 2006. (Docket Entry 14-9).

On April 30, 2007, Petitioner sought post-conviction relief in the Criminal Court for Davidson County. (Docket Entry 14-5). After a hearing on September 7, 2007, the court denied Petitioner's petition for post-conviction relief. (Docket Entry 14-5, pp. 26-31). Petitioner appealed this decision to the Tennessee Court of Criminal Appeals on October 9, 2007. (Docket Entry 14-10). The Court of Criminal Appeals affirmed the judgment on January 6, 2009, and the Tennessee Supreme Court denied review on May 26, 2009. (Docket Entries 14-12, 14-13). Petitioner timely filed this action on October 21, 2009. (Docket Entry 1).

## II. PROCEDURAL HISTORY AND FACTS

Petitioner initiated this action with the filing of a habeas corpus petition on October 21, 2009. (Docket Entry 1). Petitioner presents the following claims for relief:

1. Petitioner is actually innocent of the charges for which he was convicted.

2. Petitioner was denied effective assistance of counsel.

3. Petitioner's two convictions for rape based on the same act violate the Fifth Amendment's Double Jeopardy clause.

4. The trial court failed to properly exercise its function as the thirteenth juror.

5. Petitioner's sentence was excessive.

In response to the Court's Order (Docket Entry 2), Respondent has filed an Answer to the Petition. (Docket Entry 14). Petitioner filed a Response. (Docket Entries 33, 35). Respondent filed a Reply. (Docket Entry 32). Petitioner also requested an evidentiary hearing. (Docket Entry 33).

On direct appeal, the Tennessee Court of Criminal Appeals summarized the facts of the case as follows:

> In 1987, the victim, L.S., and her sister were placed by the Department of Children's Services ("DCS") in the foster care of the Appellant and his wife, Ruth Williams. At the time of placement, the victim was six or seven years old, and she remained in the Appellant's home for the next twelve years. On November 30, 1999, the Appellant's wife injured her back. Mrs. Williams and the victim's sister later picked up the victim at her place of employment, Shoney's, and drove the victim home to be with the Williams' one-year-old biological daughter while Mrs. Williams went to the hospital. On this date, the eighteen-year-old victim was in high school and was working thirty hours per week at Shoney's.
>
> When the Appellant arrived home that evening at approximately 9:00 p.m., the victim and the Appellant's daughter were watching television, and the Appellant joined them in the living room. When a program came on that made the victim uncomfortable, she removed the little girl from the room and started playing with her in the hallway. As the victim was bent over playing with the child, the Appellant grabbed her from behind and wrapped his leg around her to prevent her from moving. Despite her requests and pleas to stop,

3

the Appellant pulled down the victim's pants and penetrated her vaginally with his penis. Afterwards, the victim locked herself in the bathroom. When she emerged she found the Appellant waiting for her. He asked her if she needed anything and told her that no one would believe her if she told what had happened.

The victim testified that she intended to tell her foster mother both that night and the next morning; however, she was unable to do so because of the Appellant's presence. She also testified that she tried to tell her sister what had occurred the next morning both at the bus stop and again later at school. According to the victim, upon discussing the matter with her sister at school, the sister became upset and began to make a scene in the classroom. At that point, the victim stated she told her sister that it never happened. Later in the day, a teacher noticed that the victim was visibly upset and began questioning her. Eventually, the victim told the teacher what had occurred, and a school police officer took the victim to the hospital for an examination.

A forensic examination was performed at Metro General Hospital, and the presence of sperm was detected. The victim was removed from the Appellant's home and placed in the temporary care of other foster parents outside Davidson County. The victim was eventually placed at Richland Village, a group care facility for juveniles with problems, because no other foster placement could be found. The victim testified that she felt like a prisoner at Richland Village, in addition to being separated from her family and friends. She eventually dropped out of high school and was forced to give up her part-time employment. She stated that she called the Appellant's sister-in-law, who told her that if she cleared up the situation, she could return to the Appellant's home. Based upon this statement, the victim testified that she wrote a letter to DCS claiming that the events had never occurred, that she had just dreamed it. However, she later maintained that she was raped by the Appellant.

DNA testing was subsequently performed on the samples collected from the Appellant and the victim. A comparison of the Appellant's DNA and DNA recovered from the vaginal swabs taken from the victim established a match.[2] The following probabilities were

---

[2] Five of the thirteen "locations" examined and the gender marker for a DNA profile matched the Appellant. The remaining eight could not be determined because the sample was too small.

4

> established: the probability of the sperm being from another African American other than the Appellant was 1/3,517,000, from a Caucasian person other than the Appellant was 1/10,790,000, from a Southeastern Hispanic other than the Appellant was 1/3,812,000, and from a Southwestern Hispanic was 1/5,552,000.

(Docket Entry 14-9) (footnote in original).

At the post-conviction hearing, additional evidence regarding the DNA evidence and the effectiveness of Petitioner's counsel was heard. The Criminal Court of Appeals summarized the testimony as follows:

> In the August 2, 2007 evidentiary hearing, the petitioner first called Joe Minor, Tennessee Bureau of Investigation special agent scientist supervisor. Agent Minor evaluated the DNA evidence that eventually resulted in the petitioner's conviction. He testified that he examined a "blood standard" from both the petitioner and the victim and the vaginal swabs that were submitted to the laboratory from the sexual assault kit performed on the victim.
>
> Agent Minor testified that he placed a portion of the vaginal swab into a chemical that performed an "extraction procedure" that extracted the DNA. He testified that the TBI laboratory had used the same DNA procedures since 1998. He stated that the "ideal" sample of DNA was one nanogram, or "a billioneth [sic] of a gram." Agent Minor, however, had tested amounts less than one nanogram. He said, "[T]here is [sic] some circumstances where we might think that the quantitation [sic] may not be accurate enough and, then, we'll proceed with testing that." He stated that the "cutoff" in which he would not perform tests on a DNA sample was "zero," meaning no detectable amount of DNA.
>
> Agent Minor testified that, in this case "we separated the sperm DNA from the female DNA . . . the sperm DNA concentrated at point zero six two nanograms." He stated that he then "amplified" the .062 nanogram sample using "a technique called PCR amplifying chain reaction" and that this procedure had "been in effect for many years." He testified, "[T]he PCR procedure targets specifics [sic] locations and amplifies, or replicates, the DNA which allows us to . . . subsequently analyze that on a three ten genetic analyzer, an instrument that produces DNA types." The 310 genetic analyzer is a "capillary electrophoresis device" that Agent Minor used "to

5

separate those short tandem repeat fragments . . . by size," and the instrument used software to aid in "measuring those fragments links." Agent Minor testified, "The policy of the TBI [], though, is to use the [software] and actually go in and look at the raw data and, you know, verify that the types are there and artifacts or anything can be accounted for. So, we don't rely totally on that [software]."

Agent Minor testified that DNA readings can be affected by "artifacts," which include "spikes . . . due to products in the polymer . . . that's injected inside the capillary" and "stutter peaks." He said, "An artifact is something that should be accountable for. If you cannot account for an artifact and you're gonna take that sample and reamplify it and re-run it." He agreed that any contamination in the DNA sample would be amplified by the amplification process; however, the TBI laboratory had procedures and policies in effect to protect against such contamination. He further testified that, to his knowledge, the TBI laboratory had never committed any errors in DNA analysis that led to an incorrect identification.

Agent Minor explained, "There are thirteen loci that are standard amongst the DNA labs. And, those fragment links that are found, short tandem repeats, that are found in those locations have been analyzed by statistical methods, which will allow you to make a statistical analysis of particular types of loci." He explained that, the greater the number of matching loci, the more likely that the DNA belongs to an individual. He testified that, in this case, the defendant's DNA matched five loci of the DNA found from the vaginal swab of the victim and that the possibility that the offender was an African American other than the defendant was one in 3,500,000. To arrive at this statistic he used the "product rule" which is a "well founded mathmatical [sic] procedure." He stated that his results did not "factor [] any potential error" because "that's not part of the rule." He testified that he was not familiar with any "rate of error" in short tandem repeat DNA testing. Agent Minor also stated that "in order to enter a profile into the [Federal Bureau of Investigation's] national data base, there is a requirement to have attempted to type all the thirteen loci that are available, a minimum requirement of submitting ten on line." He admitted that the DNA profile used to convict the petitioner would not qualify for entry into the Federal Bureau of Investigation's database.

On cross-examination, Agent Minor testified that, although .062 nanograms is a small amount of DNA, he has "typed" smaller amounts. He stated that he asked a second agent to perform the DNA

6

analysis, and the second agent arrived at the same conclusion. He agreed there was no reason that he "would exclude the petitioner in this case" because his DNA profile showed five loci matches with the DNA found in the sexual assault kit. He stated that "[t]hese were very reliable results."

Counsel testified that he was retained by the petitioner's family and that he represented the defendant in October 2003. Counsel had practiced law for 25 years and participated in 10 rape trials at the time of the petitioner's trial. He stated that he did not hire a private investigator in this case; however, he had a friend who was an investigator who might have "chased a couple of rabbits for [him]" on this case. He recalled that "[t]he key evidence was that they found [the petitioner's] DNA in the young lady's vagina."

Counsel recalled that the victim had recanted her original statements that the petitioner raped her; however, he stated that the victim later "recanted [her] recantation" and again maintained that she was raped. Although he did not have an independent recollection of a letter written by the victim stating that the rape never occurred, he "[felt] that [he] would have" introduced the letter into evidence during the trial.

Counsel stated that he wanted to pursue a theory of the case where "what had happened was that the [victim] had turned eighteen. She knew she was about to lose her home because she was no longer eligible to be a foster child. And if perhaps she had enticed . . . [the petitioner] into having sex with her thinking maybe I can, you know, can stay here. And, when that didn't happen, then all of a sudden it became rape." He wanted to pursue htis theory of the case because he "always thought . . . [the victim's] story varied a little bit and didn't make sense." However, the petitioner maintained that "it never happened under any circumstances and he never had sex with her," and counsel adopted the petitioner's theory.

Counsel testified that, because he could not discount the DNA evidence under the petitioner's theory, he was "kind of in a corner." He explained that maintaining that the petitioner never had sex with the victim, despite the fact that his DNA was identified in her vagina, "was the most awkward defense to try to go with, given the State's proof." Counsel testified that he filed an ex parte motion with the trial court to hire an independent expert to perform an independent test of the DNA sample. The trial court granted his motion, and the independent expert "came to the same conclusion, that the sample

7

> matched the DNA of [the petitioner]." Counsel did not file a suppression motion alleging that the petitioner's sample DNA, used by the TBI to compare with the DNA in the vaginal swab, was taken through an unconstitutional seizure because "had [he] objected to the initial sample that was taken, the State would have simply turned around and gotten a search warrant and gotten a sample. We would have been right back to square one."

(Docket Entry 14-12).

## III. REQUEST FOR EVIDENTIARY HEARING

Petitioner has requested an evidentiary hearing, essentially arguing a new theory of the case and arguing that his trial counsel never had the DNA evidence independently tested. (Docket Entry 33). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that – (A) the claim relies on – (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). This section restricts the district court's ability to hold an evidentiary hearing where the petitioner has failed to develop the factual record in state court. *Williams v. Taylor*, 529 U.S. 420, 432 (2000). *But see Abdur'Rahman v. Bell*, 226 F.3d 696, 706 (6th Cir. 2000) (§ 2254(e)(2) indicates when a petitioner is entitled to a hearing, not whether the district court has the inherent authority to order a hearing). The failure to develop is defined as a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel" in his or

8

her attempts to discover and present a claim in the state court. *Williams*, 529 U.S. at 432. The prisoner must have made "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in the state court." *Id.* at 435.

If the failure to develop the record was the fault of the state trial court, an evidentiary hearing is not barred. *James v. Brigano*, 470 F.3d 636, 642 (6th Cir. 2006). However, "bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring . . . an evidentiary hearing." *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). While the district court has the inherent authority to set an evidentiary hearing in a habeas action, such hearings are set "to settle disputed issues of fact." *Abdur'Rahman*, 226 F.3d at 705-06.

Here, Petitioner is essentially requesting a retrial in federal court. Petitioner's request revolves largely around his claim that he is actually innocent. Petitioner argues that the victim had a motive to falsely accuse him of rape and that his counsel failed to have the evidence independently tested or to present any evidence or witnesses on Petitioner's behalf. The first argument is a bald assertion with no real relevance to Petitioner's constitutional claims. Even if true, there was sufficient evidence to support Petitioner's conviction. Petitioner's second argument was addressed in the post-conviction hearing. His attorney testified that he did, in fact, have the evidence tested, but that the independent expert came to the same conclusion as the TBI investigators. (Docket Entry 14-6, pp. 48-49). Petitioner's trial attorney also testified that Petitioner's insistence that he did not have sexual intercourse with the victim greatly hampered the defense, in light of the DNA evidence. *Id.* at pp. 47-48. The Magistrate Judge does not believe Petitioner's arguments indicate a need for an evidentiary hearing and recommends the request be denied.

9

## IV.  ANALYSIS

When a federal habeas corpus claim has been adjudicated on the merits in state court, the state court adjudication will not be disturbed unless it resulted in a decision contrary to clearly established federal law or involved an unreasonable application of federal law in light of the evidence.  28 U.S.C. § 2254(d).  A state adjudication is "contrary to" clearly established federal law if it "arrives at a conclusion opposite that reached by the [United States Supreme] Court on a question of law or . . . decides a case differently than the Court . . . on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 364-65 (2000).  Similarly, a state court decision that "identifies the governing legal principle from the [United States Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" is contrary to clearly established federal law.  *Id.* at 365.

When state courts have made factual determinations regarding issues presented for federal *habeas corpus* review, such determinations are presumed to be correct, and the petitioner has the burden of rebutting that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).  *See Miller-el v. Cockrell*, 537 U.S. 322, 324 (2003).  The purpose of federal *habeas corpus* review is to "ensure that state court convictions are given effect to the extent possible under the law," not to conduct a federal re-trial.  *Bee v. Cone*, 535 U.S. 685, 693 (2002).

**1.  Actual Innocence**

10

Petitioner's first claim is that he is actually innocent of the charges for which he was convicted. An "actual innocence" claim is an exception to the requirement that a petitioner must have exhausted his state court remedies. *See Dretke v. Haley*, 541 U.S. 386, 393 (2004). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). A petitioner who alleges that he is actually innocent of the crime must show that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *See Schlup v. Delo*, 513 U.S. 298, 327 (1995). The petitioner must submit new and reliable evidence that was not presented at trial. *Id.* at 324.

Here, as noted above, Petitioner attempts to argue that the victim had a motive for falsely accusing him of rape and that his attorney failed to actually have the DNA evidence tested by an independent expert. Petitioner has failed to provide any new and reliable evidence that he is factually innocent of the charges against him. His actual innocence claim should fail.

**2. Ineffective Assistance of Counsel**

A claim of constitutionally ineffective assistance of counsel comprises two elements: (1) the attorney's performance must have been deficient, falling below an objective standard of reasonableness; and (2) the attorney's deficient performance must have prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To determine prejudice, it is necessary for the petitioner to show that counsel's failure to act properly rendered the result of the trial and subsequent appeal unreliable or fundamentally unfair. *Lockhard v. Fretwell*, 506 U.S. 364 (1993). When considering such a claim, counsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional judgment. *Mallett v. United States*, 334 F.3d 491, 497 (6th Cir. 2003).

Petitioner argues that his counsel's performance was deficient because counsel failed to challenge the DNA evidence at trial, failed to investigate the victim's background, and failed to offer any proof of the victim's recantations. These bases were addressed in the post-conviction proceedings, where Petitioner's trial counsel testified that he had, in fact, had the DNA evidence tested by an outside expert (who reached the same conclusion as the TBI) and that he did not file a motion to suppress the DNA evidence because it would have been futile, as the State could have obtained a new DNA sample from Petitioner with a search warrant. (Docket Entry 14-6, pp. 55-56). Petitioner's trial counsel also testified that he did not put any proof on at trial because, while Petitioner's family members would have been willing to testify that the victim was untrustworthy, he could not prove the DNA evidence was planted, and Petitioner took the position he had never had sexual intercourse with the victim. *Id.* at 56-57. Moreover, proof of the victim's recantation was offered at trial by the State, and Petitioner's attorney was able to cross-examine the victim on that point. (Docket Entry 14-2, pp. 49-52, 60-61).

Petitioner also argues that his attorney had a "conflict of interest" because the attorney's proposed defense theory differed from Petitioner's. It appears that trial counsel pursued Petitioner's defense as far as he was able, but that the DNA evidence clearly rebutted Petitioner's claim that he had never had sexual intercourse with the victim. (Docket Entry 14-6, p. 54). In short, counsel acted reasonably in pursuing Petitioner's preferred defense theory. Petitioner's trial counsel performed reasonably under the circumstances, and Petitioner's claim based on ineffective assistance of counsel should fail.

12

### 3. Double Jeopardy

Petitioner argues that, because he was convicted of two counts of rape for one act, his rights under the Fifth Amendment's Double Jeopardy clause have been violated. The Double Jeopardy Clause protects a defendant against multiple punishments for the same offense. *Monge v. California*, 524 U.S. 721, 727-28 (1998). The jury convicted Petitioner of both rape by force and rape without consent, and he was sentenced to twelve (12) years for each crime, to run concurrently.

On direct appeal, the Tennessee Court of Criminal Appeals addressed the issue of double jeopardy and corrected the trial court's judgment by merging the two counts. (Docket Entry 14-8). To the extent that Petitioner had a cognizable claim that his rights under the Fifth Amendment were violated in the original judgment, the appellate court corrected any violation. Petitioner has therefore not alleged a valid claim for relief.

### 4. "Thirteenth Juror"

The Magistrate Judge believes Petitioner is essentially claiming there was insufficient evidence to convict him. Petitioner's argument on this ground is, in many respects, a rehashing of his "actual innocence" argument. For the same reasons, Petitioner has not stated a valid claim for relief on this ground.

Petitioner relies on the so-called "thirteenth juror" rule in Tenn. R. Crim. P. 33(f), which provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(d).[3] Petitioner agues that the trial court failed in its duty by not ordering a new trial. The Court of Criminal Appeals,

---

[3] Subsection (f) was renumbered as subsection (d) in a 2006 amendment.

13

however, considered and rejected Petitioner's argument. (Docket Entry 14-8). The court explained,

> Tennessee Rule of Criminal Procedure 33(f) imposes a mandatory duty on the trial judge to serve as the thirteenth juror in every criminal case. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). "Rule 33(f) does not require the trial judge to make an explicit statement on the record. Instead, when the trial judge simply overrules a motion for a new trial, the appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict." *Id.* Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror, may an appellate court reverse the trial court's judgment. *Id.* Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim App. 1993). If the reviewing court finds that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial.
> [...]
> The trial court's order reflects that the trial judge was aware that to grant a new trial under Rule 33(f), "the trial judge must disagree with the jury's finding on the question of the defendant's guilt." The record, however, contains no statement or comment by the trial judge, after review of its "notes taken at trial" or its recollection of the trial testimony, indicating disagreement with the jury's verdict. Furthermore, there is nothing in the record which suggests that the trial judge was attempting to avoid its obligation under the rule. In sum, we conclude that the absence of the word "weight" in the court's analysis under the facts of this case does not require reversal of the entire trial process. While we agree that the trial court's choice of the adjective "sufficient" was a poor choice to modify the noun "evidence," the trial court's order demonstrates that the court examined the issue under the proper standard, and, in denying the motion, simply misspoke in its conclusion.

(Docket Entry 14-8, pp. 6-7). Because a state court's interpretation of state law is binding on a federal court in habeas corpus actions, the Magistrate Judge defers to the Court of Criminal Appeals and its interpretation. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

14

Even if the Magistrate Judge considered this as an insufficient evidence claim, it would fail for the same reasons outlined for Petitioner's "actual innocence" claim. The Supreme Court has defined sufficient proof for conviction as the "evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). When weighing the sufficiency of the evidence to support a criminal conviction, the Court must view the evidence in a light most favorable to the prosecution. *Id.* at 319. Here, the DNA evidence and the victim's testimony provided sufficient evidence to convince the jury beyond a reasonable doubt that Petitioner was guilty of rape. While Petitioner may question the validity of this evidence, it is unquestionably sufficient for his conviction.

**5. Application of Enhancement Factors**

A federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1); *Cohen v. Tate*, 779 F.2d 1181, 1184 (6th Cir. 1985). Although exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine that promotes comity between the state and federal governments by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Granberry v. Greer*, 481 U.S. 129 (1987). As a condition precedent to seeking federal habeas corpus relief, the petitioner is required to have fairly presented his claims to the state courts. *Rose v. Lundy*, 455 U.S. 509, 522 (1982); *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). A claim cannot have been fairly presented unless it has

15

been raised at every level of the state court system for consideration. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). The exhaustion requirement is satisfied if the petitioner's federal claim has been raised in the highest state court available, even if that court refused to consider the claim. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).

Petitioner argues that the trial court erred in applying two enhancement factors to his sentence that were not found by a jury, in violation of *Blakely v. Washington*, 542 U.S. 296 (2004) and *Cunningham v. California*, 549 U.S. 270 (2007). Both cases were decided before Petitioner filed his petition for post-conviction relief. However, Petitioner did not raise this theory with the state courts, and his claim must fail.

Having independently reviewed the record, the undersigned finds that the result of petitioner's trial and appeal was neither unreliable nor unfair. Therefore, the state court judgment with respect to petitioner's ineffective assistance claim was neither contrary to clearly established federal law, nor did it involve an unreasonable application of federal law in light of the evidence.

## IV. CONCLUSION

For the foregoing reasons, the Magistrate Judge **RECOMMENDS** that the Petition be **DENIED** and this matter be **DISMISSED**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days from receipt of this Report and Recommendation within which to file with the District Court any written objections to the proposed findings and recommendations made herein. Any

party opposing shall have fourteen (14) days from receipt of any objections filed regarding this Report within which to file a response to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 1111 (1986).

Entered this 14th day of July, 2010.

/S/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge